Good morning, Your Honors. Good morning. May I proceed? Yeah, everybody's, uh, sure. Thank you, Your Honor. My name is Wayne Bedoin. I would like to reserve five minutes for rebuttal, if I may. Sure. I'm here today with my client, Mr. Arnold Nance, and his wife in the gallery. May it please the Court, the Court has before it over 200 separate facts, which the lower court decided did not, uh, failed to raise a tribal issue of material fact in dispute in this case. I submit to the Court that a great deal of those facts submitted to the lower court and now to this Court are, in fact, disputed. To the extent Mr. Nance needed to establish that he had brought a claim under Section 1514A, I believe the proper prior fact would be the jury in light of the contested facts at issue here. Whether Mr. Nance engaged in protected activity, what is that protected activity? Protected activity is a learning upper management that there is a perceived problem with the sub counts. Those sub counts determine the market share, the revenue to Time Warner Cable, and to the extent those counts are wrong, the revenues would be overstated, the amount paid for Comcast where it acquired those additional sub counts, that amount paid would have been overstated. Isn't it protected only if it's fraud, if he discloses fraud? I don't think it's limited to fraud. Isn't that what the statute says? The statute provides that the plaintiff must communicate what he reasonably believes to be a violation of either Sarbanes-Oxley Act or else a securities law. You're talking about 1514? Doesn't that require some species of fraud? Section 1348 does talk about securities fraud and that is one of the various rules of law that the petitioner can claim was violated. He doesn't have to come out and say, yes, there was fraud. All he needs to show is he communicated what he reasonably believed could be fraud or some other illegality under the securities. That's the problem I have with the case. The letter specifically says there is no fraud here. It sounds like just an accounting disagreement. The letter is Mr. Nance doing his best as a good employee. I take you at your word, but it says we have no knowledge of any fraud or suspected fraud. And that's a representation letter that he signed to the auditor. And the law does state that that does not go to a state of mind as to whether that was either objectively or subjectively reasonable as to whether he considered there was fraud. I'm not sure I understand what you just said. He signs a representation letter in which he represents that he has no reason to believe that there was any evidence of fraud or suspected fraud. He alerts upper management to what, as my colleague characterizes it, is an accounting issue. That accounting issue is then referred to the outside auditors who basically conclude that it is not material for purposes of gap and therefore there is no need to disclose it. I just don't see where he falls within the purview of Section 1514A, and therefore there is no protected activity here. Well, if I report to my employer that I am aware of certain circumstances that if not addressed, taken care of, and corrected, will result in a knowing misrepresentation in its public filings, I believe I fall within the statute. But the knowing misrepresentation is a fraudulent act, and he hasn't alleged that. It would be a very different circumstance if he had not raised it with upper management and if it had not been disclosed to the outside auditors for their consideration. But he did all that, and there's no allegation here that the opinion by the outside auditors was some part of an ongoing civil conspiracy to defraud the stockholders of Time Warner. You don't have any of those kinds of allegations. But again, we're not limited to a claim of fraud under Section 1514A. You're essentially trying to fall within the umbrella of whistleblower protection. I mean, that's basically the underlying claim here. But the mere fact that an employee raises an issue which his upper management disagrees with on the basis of an outside independent auditor's recommendation and then fires him at some point down the road for reasons that Time Warner says has nothing to do with this issue, doesn't necessarily give him, as a matter of law, entitlement to claim whistleblower protection so that he can bring suit under the generation statute. I disagree. He is communicating to upper management that they have a problem which, if it's not addressed, will make their public filings incorrect. Regardless of what the outside auditors ultimately conclude, that has no relevance as to whether he is engaging in a protected activity. Maybe you and I are talking past one another, but it just seems to me the fact that he raises an issue of concern to his upper management, which he doesn't say is fraud, and which is investigated by upper management who basically disagrees with him, and maybe they decide he's not a very good financial officer because he should have been able to make that determination on his own. I don't know. But the point is he's got to establish a prima facie claim for, in essence, whistleblower protection. And the district court dismissed this case on the ground that he didn't reach the prima facie stage. If that's the case, why isn't summary judgment appropriate without regard to your 200 issues of fact that you say are in dispute when, as a matter of law, those facts are irrelevant because they don't establish a prima facie claim? Judge Talman, I disagree that management disagreed with Mr. Nance. The fact? Did they change the financial statements? Not that I'm aware of. Sounds like they must have disagreed then. Others signed off on this. I mean, the problem seems to me is similar to what Judge Talman has identified. Whistleblower protection is limited to somebody that blows the whistle on something that matters. The statute defines it specifically. It's not complaining about something that doesn't affect the company. In this case, company management finds out about the problem identified by your client, hands it over to the outside auditor. So it's not a matter of something being covered up any longer. So what exactly is the protection? How does your client fall within the protection of the whistleblower statute? It's not being covered up? Well, there has been no investigation. Handing it out to an outside auditor for a determination of whether they believe it's material or not, my position is that that's irrelevant what happens after the fact. This is an employee. He's telling management, we have a problem with our numbers that we have disclosed to the public that we need to correct. Whether or not the outside auditor says it meets the material threshold, this is an issue that carries potential liabilities moving forward. But the whole purpose... Why do we have a whistleblower? Because the whole purpose of GAAP and of the securities laws are to make sure that the investing public is presented with a fair and accurate portrayal of the business operations of the company. That inherently requires a minimal level of materiality, which he didn't mean here. This was just not one of those issues that is going to make a difference in the market price of the stock. And the fact that he's complaining about it doesn't mean that he's entitled to be called a whistleblower just because he thinks that it's an issue. If you had better facts, if you had an opinion by the outside auditor that you really need to disclose this, but for some reason it just didn't get disclosed, then I would think you had a much stronger claim that there might be collusion and evidence of conspiracy to misrepresent here. But you don't have any of those facts. But we do. To the extent... I mean, I put it in the brief. The SEC, they're the ones who we should look to to determine whether it's material or not. The SEC says any intentional failure to correct or an intentional misrepresentation is material. I agree with you. If he wrote in the letter, I have discovered that the subcount has been fraudulently adjusted. Then you've got a fraud problem. What you have here is simply a disagreement over the way the count was made, and he's bringing it to somebody's attention, saying there's nothing fraudulent about it, this is the way we see it. That doesn't look to be within the designated categories of disclosures that 1514A envisions. It requires fraud. This Court has said fraud does not need to be stated. When the employee says, I find a problem with our numbers count, and this could have an impact that goes into tens of millions of dollars in consequences, this Court says he does not need to say fraud. I don't know what you're referring to when you say this. Van Asdale. I'm talking about the Sarbanes-Oxley whistleblower exceptions that require a revelation of fraud. If a company is required by the SEC to provide accurate statements... You're stripping Sienter entirely out of the securities laws, because there can be accounting disagreements that are worth millions and millions of dollars, and the fact that a company decides on treatment A, and it turns out, usually after years of litigation, that treatment B was appropriate, that doesn't mean that reporting their financial statements under treatment A constituted securities fraud. You're trying to offer up exactly that kind of standard by trying to say that the SEC requires the numbers to be reported accurately. It does not mean, and the securities laws do not say that in an accurate reporting, because it turns out the accounting treatment was wrong, constitutes securities fraud. Where's the fraud here? The fraud is knowingly failing to investigate. Wait. Your senior ranking employee in charge of looking at these numbers has told you they are incorrect. Well, you've got to stop there, because knowingly fail to investigate. For the purposes of the financial statements in question, they turn to the outside auditor and say, here's this problem. Now what? And the outside auditor says, it doesn't matter. The outside auditor says it's not material. Which for securities fraud purposes, because remember, not every mistake amounts to securities fraud, even if it's intentional. If you discover that there's a $500 cover-up someplace in a department of the company, and that it affects the bottom line of the company by $500, that's still not going to constitute securities fraud, because the company issued the statements, because of materiality. And what the auditor said here is, to the company, you can issue these financial statements anyway, because this amount simply isn't material. The problem is even more fundamental than that, because Mr. Nance's disclosure wasn't, I have found something that's been covered up or that you won't investigate. What he just said simply was, there's a discrepancy in the subcount. He didn't accuse anybody of covering it up or falsifying it. He did accuse somebody of intentionally manipulating the numbers, though. And he received that with his interview with Ms. Ducey, the one responsible, who said that she applied a factor to these numbers while she was at Comcast. But he never even looked at the definition under the subaccount agreement that defined how this was to be done. And it looked to me like there's actually a fairly ambiguous description of how these particular subaccounts should be accounted for. But he didn't even bother to look at the underlying contract. So the mere fact that he makes a claim to his upper-level management that there's a problem here may be totally wrong. And the fact that he thinks there's a problem doesn't get him past the scienter and the materiality requirements that I think you've got to get past in order... But he can be wrong under the law. He's entitled to be wrong. But he also has to be reporting something that's a violation of SOX. Correct. And he believes... And we don't see where the violation is. He believes that there's a misrepresentation of the subaccount. Well, his belief isn't enough by itself. No. So what more do you have? He reports it. Materiality, that's something that, according to the SEC, any knowing misrepresentation is material. Now, whether the outside auditors agreed or disagreed, it's irrelevant at this point. He is saying, in my mind, this needs to be disclosed, this needs to be addressed. We could be looking at potentials of millions down the road. Now, the scienter, it goes into where somebody receives this information and they do nothing to investigate it. They toss it out to outside accountants, but what are they giving them? We don't know. One question before you lose your time. You've made references to millions of dollars down the road, and I've tried to look at the part of the record that we have. What evidence is there that these numbers were used for the ad sales themselves, as opposed to the divvying up of the money by the various cable companies received from ad sales? Mr. Nance's declaration as to how the ad sales or the cost to the third-party participants in AdLink, how those costs are determined, and that's a function of market share. If market share is overstated, then those participants in AdLink are overpaying for their right to participate. Who are the participants in AdLink? Other cable companies. But what does that have to do with the advertiser? The advertiser doesn't pay based on purported number of subscribers. The advertiser pays on ratings. The advertiser pays based on the market share. The larger the market, the higher the cost to the advertiser. But what the advertiser pays is whatever the advertiser pays. We're arguing about it. What your contention is is how it's divvied up among the people who participate. Is that right? Right. And how is Time Warmer exposed to millions of dollars down the road as a result of the divvying up part? Because, in fact, what happens is that if Comcast's share is exaggerated, it potentially, I guess, has a claim for whatever past excessive take there was by Comcast. But looking forward, basically, Time Warmer is like, what is it, 90% or something like that of this AdLink consortium in the future? Basically, it's taking money out of one part of its pocket and putting it into another. Who else is going to complain? Who is Time Warmer exposed to? The other 10% or actually the other 22% that shared in it? And what about the people before the merger? Before the merger is Time Warmer. The ones before the merger, before they acquired Comcast, they only owned 15% to 17% of the market share. Afterwards, I believe it was 77% to 78%. I see you're out of time. Let's just go through this. Thank you, sir. Thank you, Your Honor. Your Honor, good morning. My name is Jason Mills. I'm with Morgan, Lewis & Bakke. I'm here on behalf of Time Warmer Cable. And also here on behalf of Time Warmer Cable is Greg Drake. I think what I'll kick off with here is kind of the concept, really the underlying concept of what it is we're talking about, which is this issue of subscriber counts. Because really what we're getting at, really at best, is an accounting issue. Because when we're talking about subscriber counts, like Judge Tomlin has pointed out, the definition is inherently vague. Because what we're trying to figure out is how many people are actually watching a television. And it's impossible to know that because you might have one television in one house but five people watching it or two televisions in another house or a multi-dwelling unit that has 50 televisions and 100 people watching them. There's no precise way to know how many people are watching a television because you just don't have any idea how many people are in a room at any given time. And so what we're talking about is this inherently vague concept from the start, which is how many people are watching televisions. And I tell you, part of the problem was that the determination of how many sets of eyes were watching, because it's inherently difficult to determine, was different as among the different companies or was different before Time Warner acquired a larger share through Comcast? And that would have been Mr. Nance's speculation. That's correct. What happened is after Time Warner Cable acquired Comcast, Mr. Nance ran the numbers on sub-counts and he determined that the numbers he was getting based on the calculation that Time Warner Cable was using was a lower number of sub-counts than whatever calculation Comcast had been using. Mr. Nance didn't have any idea how Comcast reached those numbers. He had never read the definition in the admin contract that would have explained how those numbers are calculated. And, in fact, it turns out he was wrong. Well, he can be wrong, but that's not the point. The point is, is he protected by making these disclosures right or wrong? And that's correct. He could be right or wrong. But the reason it's relevant that he was wrong is because he didn't know how it was defined in the first place. So, in a way, I'm almost cutting to the subjective belief requirement. Mr. Nance couldn't have even reasonably or subjectively believed that Comcast was doing some kind of improper count of sub-counts because he didn't even know how those numbers were being calculated or how they should have been calculated. So, that's why, down the road, the only thing Mr. Nance ever addressed was a difference in sub-counts. And, in fact, if you look at the timeline, he raised that issue once in October of 2006 and then he claims to have discussed it one time again, I believe, in January of 2007. He never raised it again, never mentioned it again, despite multiple opportunities to put that in a representation letter, until after Barry Feldstein was transferred to the West Coast and after Mr. Nance indisputably was concerned that Barry was going to take his job. And when was that? Mr. Feldstein moved, it was, everybody was made aware that Mr. Feldstein was coming to the West Coast in December of 2007. And he and Mr. Nance talked. Mr. Nance immediately sent an email to the Human Resources Department saying, clearly, that he was concerned that he was going to lose his job, concerned how this was going to affect the department. And it was actually about ten days after that that Mr. Nance found the email that he had, found the email showing the sub-counts from October 2006 or maybe, I think, November 2006. He asked one of his colleagues to send him that email after he knew Mr. Feldstein was coming to the West Coast. And it was that email that he decided for the first time, after multiple opportunities, to include that exception on the representation letter. And as I'm referring to the representation letter, actually, we've already discussed the fact that he expressly states in the representation letter that there is no knowledge of any fraud or suspected fraud. And that is clear and expressed in the letter that is founding his whistleblower claim. And then at the end, in the actual exception, what he's reporting is a loss of potential revenue. A loss of potential revenue cannot be an allegation of fraudulent conduct. Even taking away the language that says there is no fraudulent conduct. So, well, I think you misread what he said. Loss of potential revenue to the other, to Time Warner and to the other partners that they would have to theoretically pay back. That's correct. And the fact is if there was a loss of potential revenue, that's something that Time Warner Cable could go after Comcast for. So the issue of a loss of potential revenue, though, would not create the specter of fraud. It doesn't mean anything. It means I looked at the, I looked at our financial statements and it looks like maybe we could get some money from Comcast. That's where it begins and ends. And it, again, is based on Mr. Nance's speculation as to what the ad-link definition of sub-count would have been in the first place. One other important point in that timeline is that when Mr. Nance first noted this apparent issue with the sub-counts, he communicated with Shabnam Dungy about it, who was the person responsible for the sub-counts at Comcast. And she sent him an email showing him the entire breakdown of how those sub-counts were calculated. So as of October 2006, Mr. Nance already knew exactly how Comcast had calculated its sub-counts and he had all the information he needed. If he actually thought that created any kind of issue at all, he obviously did not, which, again, I suppose is bold. I'm not following the relevance of this point that you're making. So what? Well, the relevance of this point, again, I suppose is bold to look at the protective activity, but there's a number of elements. Even if he is wrong, even if he is dead wrong, if he discloses what he thinks is fraud, he's covered by the safe harbor of 1514A, isn't he? Yes, that's correct. That is correct. And the fact of the matter is he never disclosed fraud. So perhaps I'm jumping the gun there. He never disclosed fraud. There was some talk about there being 200 facts and many of them are in dispute. That's really not the case. The communications are not in dispute. I would actually compare this to Van Asda where there was clearly a disputed issue as to whether or not the plaintiffs there had alleged concealment of clearly material issues with regard to these patents and these wheels that weren't in existence, these casino wheels. And that's not the case here. The reason his comment was. . . It wasn't. . . Isn't there in the record a statement or perhaps this deposition testimony from Mr. Feldstein where he essentially when Mr. Nance raised the issue in connection with the representation letter, Feldstein basically said, I'm going to leave it up to you to decide whether or not to include that issue in the representation letter. That's correct. Before Mr. Nance signed off the representation letter, he sent out a communication which included Mr. Feldstein. Mr. Feldstein responded and had basically feedback on the exceptions. And with regard to that exception, that issue, Mr. Feldstein said, I think we should hold off on it, but I defer to you. So basically do whatever you think is right for me. It's your job. And that would be another one of the undisputed communications that goes to show they're just talking about at most an accounting issue. But what really is just Mr. Nance's speculation that there's a difference in the numbers and that. . . So there's no evidence in the record that the plaintiff was able to induce that Feldstein told him, don't include it in the representation letter, don't look into it any further, let sleeping dogs lie. That's exactly right. In fact, the undisputed evidence is the opposite of that. The undisputed evidence is that Mr. Feldstein never told him not to look into it or told him to be silent on it. And Mr. Feldstein just invited him to include that in the exception letter if he wanted to. It truly was nothing more than an accounting issue, nothing more than Mr. Nance doing his job and reporting what he thought was some kind of a difference in the way numbers were calculated. It never got beyond that. And frankly, it never was an issue because there wasn't anything there. But that was it. It was Mr. Nance doing his job. The date of the letter is January 8, 2008. That is correct. And when was Mr. Nance terminated? In mid-February. That's pretty close in time. Well, if you're calculating from the date that he signed the rep letter until the date that he was terminated, sure, that's close in time. That's one of their main points, that there's a temporal proximity is enough to raise a jury question. Fair enough. And we'd obviously have to get past the protected activity even to get there. But that's actually not really following Mr. Nance's somewhat obscuring the timeline there. The fact is, accountants like Mr. Nance are signing off on rep letters every quarter. So Mr. Nance's termination, if he's going to be terminated, is going to happen sometime shortly after a rep letter. He had five quarters to submit those rep letters. He just waited until January of 2008 to actually sign it, to include that exception, even though it's undisputed that he had this knowledge as of October 2006. He reported, or at least raised the issue of the subcount in October 2006. He wasn't terminated until February of 2008. So that's actually much longer. Well, maybe that's your answer to it. But, I mean, they have some evidence that you could draw a different conclusion. If we were looking purely at the amount of time that passed between signing the rep letter and Mr. Nance's termination, I agree that that is relevant to determining temporal proximity. But as this Court has actually stated in Van Asdel, that's not where the analysis stops. You actually would look to the surrounding facts and look to possible evidence of bad faith. And in that case, we would actually be looking at some bad faith here. But we would still have to first conclude that this amounted to protected activity before we get to the temporal proximity analysis, right? That's correct, Your Honor. Long before we got to temporal proximity, we would have to find that it was a protected activity. And the fact is, he never communicated fraud. There's a lot of talk about whether or not you must actually use the word fraud. I got it. You don't actually need to say the word fraud, but you have to at least communicate some kind of fraud. And that just isn't here. It's an accounting issue. Even beyond that, it would have to be reasonable both objectively and subjectively. The evidence, not even for the subjective good faith belief, is there. I mean, the evidence just is not there in the record. And then if we got to temporal proximity, even if that were the issue that Mr. Nance's case were hinged on, he would fail there because there's evidence of bad faith. And that timeline is not what Mr. Nance wants it to be. And if Mr. Nance wants to hang his head on that timeline, he really needs to be cautious. Because what it shows is that Mr. Nance is reacting every time he's unhappy with something going on with his employment situation. And that's evidence of bad faith. And based on that, and based on the Van Asdel decision, that means that he does not establish a prima facie case in that temporal proximity. Your Honors, I will leave it there unless there are any other questions that you'd like me to address. I don't think so. Thank you very much. Thank you very much. You used up all your time, but if you'd like a minute in rebuttal. Yeah. The text of 18 U.S.C. section 1514A provides that protected activity for the purposes of that section includes reporting any conduct which the employee reasonably believes constitutes a violation. He does not need to be correct. A violation of, that it's mail fraud, securities fraud, and all those other types of fraud. Correct. It's not just any violation of, you know, parking regulations or anything else. It has to be fraud. It has to be a type of crime. His belief that some sort of crime has occurred. He has to believe it's a crime. Right. And the problem with your letter is he says, I don't know of any fraud. Case law says, you look at the letter, that doesn't go to whether his reporting was reasonable or unreasonable or whether he reasonably believed that a crime was being committed. Did he reasonably believe he was committing a fraud by signing a letter that said there was no fraud? I have no idea. The fact is, a jury needs to determine whether that belief, as expressed to management, was reasonable. I don't see how the trial court has to replace itself with a trier of fact to determine whether it's reasonable. And we can argue whether, based on his experience, his failure to look at the contract, to define sub counts, were all of these things that go into whether his opinion was reasonable. Yes. That's why the trier of fact must determine whether what was happening in Mr. Nance's head was reasonable. That's why the jury should be deciding that prima facie issue and not the court. Thank you, gentlemen. Thank you. The case just started to be submitted. It will stand in recess. Thank you very much. All rise for assembly recess.
judges: Silverman, Tallman, Clifton